UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

JOHN W. WINDSOR, JR.,

           Plaintiff,

v.

WHITMAN-WALKER CLINIC, INC.

and

ADAMS & WIGHT

and

JOHN DOE
ADDRESS UNKNOWN

           Defendants.

Case No.: 1:07-cv-01020 RMC

**REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**I. Plaintiff Relies Upon the Wrong Motion to Dismiss Standard; His Claims Should be Dismissed When the Correct Standard is Used**

In the recently-decided case of *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the United States Supreme Court replaced the standard to be applied to a motion to dismiss promulgated forty years ago in *Conley v. Gibson*, 355 U.S. 41 (1957), upon which Plaintiff relies, with a more exacting test. The *Conley* standard was that:

> a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

355 U.S. at 45-46. The Supreme Court found, however, that the *Conley* standard "has been questioned, criticized, and explained away long enough." 127 S. Ct. at 1969. The *Conley*

1

language has been "puzzling the profession for 50 years" and "has earned its retirement" because it is "best forgotten as incomplete." *Id*. The new standard set forth in *Twombly* is that a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. In other words, in the face of a motion to dismiss, a common sense reading of the facts alleged must support the claim, otherwise the claim must be dismissed.

On the facts Plaintiff alleged in the Amended Complaint, his claims are implausible. His contention that the Professional Rescuer Doctrine ("PRD") does not apply because he was no longer engaged in his duties as a firefighter at the time of his accident defies common sense. Nor is it plausible that the relationship between the Clinic and Adams & Wight, the construction contractor, was anything other than an independent contractor relationship. Therefore, Plaintiff's claims against the Clinic must be dismissed.

## II.  Plaintiff's Claims Are Barred by the Professional Rescuer Doctrine

Plaintiff has alleged that:

- He was a professional firefighter (Am. Compl. ¶ 1);
- He was in the building in response to a fire (Am. Compl. ¶¶ 6, 12);
- He was on second floor of the building looking for trapped persons when he fell (Am. Compl. ¶¶ 7-8); and
- Because of the smoke from the fire, he did not see that the stairs did not have a banister (Am. Compl. ¶¶ 7, 10; Pl. Opp'n at 7).

The PRD states that "those engaged in rescue work as part of their employment may not, as a matter of law, recover for injuries sustained by them on the job, from those whose negligence was the proximate cause of the injuries" because "...the professional rescuer is held to

2

have assumed the risks attending his work." *Gillespie v. Washington*, 395 A.2d 18, 20 (D.C. 1978). The PRD has been affirmed and applied repeatedly in the District of Columbia since it was originally set forth in *Gillespie*.[1]

In his Opposition to the Motion to Dismiss, Plaintiff asserts that when he fell he had secured the building, thereby arguing that he was no longer engaged in professional firefighting activities. Pl. Opp'n at 6. It is unnecessary to gather a jury of eight or twelve persons to find that whether Plaintiff had secured the building or, as he alleged in the Complaint, he was looking for trapped persons, he was engaged in professional firefighting activity. Accordingly, on the facts that Plaintiff alleged in his Amended Complaint, the PRD applies.

The case of *Lee v. Luigi*, 696 A.2d 1371 (D.C. 1997) is factually akin to this case. In *Luigi*, a police officer was injured by a hazard - debris on a staircase - that was not the particular hazard that had brought him to the premises. The Court found nonetheless that it was an inherent risk of his duties as a police officer to enter unsafe premises, and that the PRD therefore barred his claims. *Id.* at 1373. The same is, of course, true of the duties of a firefighter. Although a stairwell without a banister may not have been the hazard to which Plaintiff was responding, it is an inherent risk of fire fighting that it may take place in buildings that are structurally unsafe.

Plaintiff also argues that the PRD does not apply because the absence of a banister was a concealed condition. In doing so he relies upon on a five-sentence *per curiam* opinion from 1959, well before the adoption of the PRD. *Scottish Rite Supreme Council v. Jacobs*, 266 F.2d 675 (D.C. Cir. 1959). Assuming, *arguendo*, that there were an exception to the PRD for injuries caused by concealed conditions, Plaintiff's claims are implausible on the facts he alleged. In *Scottish Rite* a "concealed" condition was one which the premises owner had allowed to exist

---

[1] *See Melton v. Crane Rental Co.*, 742 A.2d 875 (D.C. 1999); *Lee v. Luigi*, 696 A.2d 1371 (D.C. 1997); *Young v. Sherwin-Williams Co.*, 569 A.2d 1173 (D.C. 1990).

with knowledge that a person could not readily observe the danger. *Id.* According to Plaintiff, it was the transient event of smoke from the fire – the very fire that brought Plaintiff to the premises – that concealed the stairway and created the dangerous condition. But for the smoke attendant to the fire to which Plaintiff was responding in his professional capacity, the lack of a banister would not have been concealed at all. *See* Pl. Opp'n at 7 ("Plaintiff could not see the lack of a railing or handrails <u>given the smoke in the building</u>") (emphasis added). Therefore, the cause of the concealment - smoke - was a condition which is a risk attendant to his profession and one which the premises owner cannot be held to have known of and failed to correct. Thus, the PRD applies.

### III. On the Facts Plaintiff Alleged, His Contention That Adams & Wight Was Not an Independent Contractor to The Clinic is Implausible

Plaintiff again asks this Court to set aside common sense in arguing that discovery is somehow needed to determine whether Whitman-Walker Clinic, which is in the business of providing medical services to low-income individuals, primarily those afflicted with HIV, somehow controlled the manner in which Adams & Wight performed structural renovations on a building that would eventually be used by the Clinic. It is clear from the face of the Complaint, and from a common sense understanding of their respective businesses, that the relationship between the two entities was not one of principal and agent. This is further demonstrated by the contract between them, which evidences a clear intent to enter into an independent contractee-contractor relationship. See Exhibit A.[2] Adams & Wight was not hired to perform functions that

---

[2] Submission of this document is proper on a motion to dismiss as it goes directly to an allegation in the Complaint. *See* Am. Compl. ¶¶ 3 ("The Defendant, Contractor, … was employed by the Defendant Clinic for the purpose of renovating the residential dwelling owned by the Defendant, which is the location of the subject incident") and 6 ("Said building was a residential dwelling owned and operated by the Defendant Clinic, which was in the process of

4

the Clinic would – or indeed <u>could</u> - otherwise perform.  There was thus no agency relationship, and no respondeat superior liability attaches to the Clinic even if it be found that Adams & Wight was negligent.

*Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59 (D.C. 1989), cited by Plaintiff, is inapposite.  *Henderson* involved an apartment building owner and the management company that it hired to perform various tasks in that building.  Those tasks, such as rental and leasing functions and building maintenance, would clearly have been performed by the building owner had the management company not been retained.  Thus the existence of an agency relationship was plausible.  In contrast, the renovation here was not something that the Clinic would have done itself had it not retained Adams & Wight.  Thus Adams & Wight was clearly not acting as the Clinic's "agent" in conducting the renovation; rather, it was acting in a quintessential independent contractor role.  It would be futile to pursue discovery in the hope that it would somehow establish that the Clinic retained the requisite control over Adams & Wight's performance of its construction work to create an agency relationship.  *See id.* at 62.

**IV.  The Clinic Had No "Duty to Inspect"**

Plaintiff's argument that the Clinic somehow had an independent "duty to inspect" the premises while they were under renovation must fail as well.[3]  As an initial matter, the Building

---

renovation.  Said renovation was being undertaken by the Defendants, Contractor and John Doe, upon Plaintiff's information and belief").  *See Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) (holding that in ruling on 12(b)(6) motion court may consider document not explicitly incorporated in complaint and not attached to complaint, but authenticity of which is not questioned and on which complaint necessarily relies); *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (if plaintiff's claims are predicated on a document, defendant may attach document to 12(b)(6) motion even if plaintiff's complaint does not explicitly refer to it).

[3] Courts in other jurisdictions have held the premises liability framework inapplicable to firefighters.  "Because firemen are likely to enter at unforeseeable times, upon unusual parts of the premises, and under circumstances of emergency, reasonable care in preparing for the visit cannot be expected, and a duty to make the premises reasonably safe for them at all times would constitute a severe burden upon the landowner."  *Carpenter v. O'Day*, 562 A.2d 595, 597 (Del. Super. Ct. 1988), *aff'd*, 553 A.2d 638 (Del. 1988).

Code provision with which Plaintiff argues the Clinic was supposed to comply is not even applicable to the type of building that was being renovated for eventual use by the Clinic. The Code section cited by Plaintiff, D.C. Mun. Regs. tit. 12, § R-315, is found in the Residential Code, while the building owned by the Clinic at which Plaintiff's alleged injuries occurred had been, and was going to continue to be used as, an office building.

Even if the Code section cited by Plaintiff would have eventually been applicable to the Clinic's building, it certainly was not applicable when, as Plaintiff concedes, the building was clearly under renovation and unoccupied. Indeed, part of the purpose of any renovation is to ensure that a structure is made compliant with applicable building codes. It certainly cannot be expected to be in compliance while it is in the process of being brought into compliance.

*Whetzel v. Jess Fisher Management Co.*, 282 F.2d 943 (D.C. Cir. 1960), which Plaintiff cites to support the notion that the Clinic "should have known" that the lack of a railing violated the Building Code, does not apply. *Whetzel* involved a landlord's statutorily-imposed duty to his tenant. Clinic and Plaintiff did not have a landlord-tenant relationship or anything approximating such a relationship. As the premises were unoccupied and under renovation, the Clinic did not owe a landlord duty to anyone.

Contrary to Plaintiff's argument, violation of a statute or regulation resulting in the harm the statute was intended to prevent does not constitute negligence *per se*. Rather, evidence of actual negligence is now usually required. *See Whetzel*, 282 F.2d at 946-948. Thus, even if Adams & Wight were found in violation of some provision of the D.C. Building Code, and even if the Clinic could be held liable for the negligence of its independent contractor, this would not result in a finding of negligence *per se* against the Clinic.

6

*Sandoe v. Lefta Associates*, 559 A.2d 732 (D.C. 1988), which Plaintiff cites, is equally irrelevant.[4] In *Sandoe*, an exterminator injured while performing a pest infestation inspection at a hotel sued both the hotel and its builder. *Id*. at 734. The hotel in question had been open for business to the public for over ten years at the time of the accident, and the plaintiff had been asked onto the premises by the hotel management when she was injured. *Id*. By contrast, this case involves an unoccupied office building under construction at which a firefighter was injured while responding to an emergency; his presence was thus unanticipated.[5] "In the District of Columbia the applicable standard for determining whether an owner or occupier of land has exercised the proper level of care to a person lawfully upon his premises is reasonable care <u>under all of the circumstances</u>." *Sandoe*, 559 A.2d at 738 (emphasis added). Plaintiff's argument that "Defendant Clinic was negligent by not inspecting its building to ensure that its building was safe" (Pl. Opp'n at 5) is unreasonable given that as he alleged, the Clinic's building was under renovation and unoccupied.

## V. Conclusion

The point of the *Twombly* motion to dismiss standard is to prevent the waste of judicial and party resources on needless litigation of claims predicated on factual theories that are

---

[4] Indeed one of the cited passages that Plaintiff purports constitutes the court's "holding" in that case – "a landowner is liable if one lawfully upon his premises is injured by a dangerous condition which, in the exercise of ordinary care, the landowner should have discovered and either corrected or warned about" (Pl. Opp'n at 5) - is in fact merely a quote from a jury instruction used in the trial below that the appellate court found lacking. Labeling it the "holding" is misleading.

[5] *See Smith v. Arbaugh's Rest., Inc.*, 469 F.2d 97, 106 (D.C. Cir. 1972) ("Of course, the circumstances of the visitor's entry have some relation to the question of landowner liability. Foreseeability of the visitor's presence determines in part the likelihood of injury to him, and the extent of the interest which must be sacrificed to avoid the risk of injury").

7

implausible and defy common sense. Plaintiff's claims against the Clinic rest on implausible factual theories and, therefore, should be dismissed.

          Respectfully submitted,

          EPSTEIN BECKER & GREEN, P.C.

          By:     /s/ John M. Murdock
                John M. Murdock (D.C. Bar # 415765)
                Julianna S. Gonen (D.C. Bar # 488759)
                1227 25th Street, N.W., Suite 700
                Washington, D.C. 20037-1175
                Telephone: (202) 861-1872
                Facsimile:  (202) 861-3572

          Counsel for Defendant Whitman-Walker Clinic, Inc.

Dated: August 17, 2007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss was served August 17, 2007, via the Court's Electronic Case Filing system upon the following:

Bruce M. Bender
Van Grack, Axelson, Williamowsky, Bender & Fishman, P.C.
401 N. Washington St.
Suite 550
Rockville MD  20850

Counsel for Plaintiff

And via First Class Mail upon the following:

Brett Weiss
Brett Weiss, P.C.
18200 Littlebrook Drive
Olney  MD  20832

Counsel for Plaintiff


_____/s/  Grace M. Balian_____

Grace M. Balian

# Exhibit A

# SERVICES AGREEMENT

This Services Agreement (the "Agreement") is made this **24th day of March 2004** between **Whitman-Walker Clinic, Inc.** (the "Clinic"), a District of Columbia non-profit corporation with its principal place of business at 1407 S Street, NW, Washington, DC 20009, and **Adams & Wight,** ("Independent Contractor"), **a corporation** with its principal place of business at 4106 Loston Court Suite 101, Fairfax, Virginia 22033. (each, a "Party", and collectively, the "Parties").

## RECITALS

A.  **WHEREAS,** the Clinic desires to retain the professional services of Independent Contractor to **renovate the 2303 Martin Luther King, Jr., Avenue, SE building** (The "Services"); and

B.  **WHEREAS,** Contractor desires to provide such services to the Clinic upon the terms and conditions stated herein. **Adams & Wight proposes to renovate 2303 Martin Luther King Jr., Avenue, SE building as per drawings and schedule submitted to Whitman Walker Clinic in their bid submitted 2/19/2004.**

NOW, THEREFORE, for and in consideration of the foregoing recitals (which are hereby made a part of this Agreement) and of the mutual covenants, promises, agreements, obligations and conditions contained herein, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  <u>Independent Contractor Services</u>. During the term of this Agreement, Independent Contractor shall provide the following services (collectively the "Services.") to Clinic:

    **Renovate the 2303 Martin Luther King Jr., Avenue, SE building as outlined in submitted bid.**

2.  <u>Work Schedule</u>. Independent Contractor provides Services in accordance with the following schedule:

    **Monday thru Saturday.**

3.  <u>Financial Matters.</u>

    (a) <u>Compensation</u>. Independent Contractor's compensation for Services rendered to the Clinic shall be as specified as follows; provided, however, that Clinic will withhold payment if Independent Contractor has failed to perform Services, or provide deliverable work product until such time as such Services or work product are delivered:
    **Payment schedule is as follows:**

| Milestone | Amount | Draw | Completion Date/Payment due |
|---|---|---|---|
| Deposit to start | $70,978.05 | 1st | 03/31/04 |
| Framing Completed | | | |
| Electrical, Data/Phone and Plumbing, Rough in completed | | | |
| Exterior Painting (weather permitting) | | | |
| Fencing | $36,026.74 | 2nd | 04/30/04 |
| Close-in Walls | | | |
| Electrical, Data/Phone and Plumbing Finishing completed | | | |
| Windows Installed | $36,026.74 | 3rd | 05/14/04 |
| Ceiling Tile & Flooring completed | $36,026.74 | 4th | 05/28/04 |

1

| Security Measures, Millwork completed | $18,013.37 | 5th | 06/11/04 |
|---|---|---|---|
| Completion of Project | $11,013.36 | Final | 06/18/04 |
| Total Cost For Job | $208,085.00 | | |

(b) <u>Taxes</u>. Clinic shall not withhold or in any way be responsible for payment or withholding of any federal, state, or local income taxes, Social Security, unemployment compensation, workers' compensation, or similar withholdings pursuant to any law, or policy, rule, or regulation of any local, state, or federal governmental body in connection with any compensation paid to Independent Contractor under or pursuant to this Agreement. Independent Contractor shall be responsible for payment of any and all taxes owed in connection with any compensation received by Independent Contractor under this Agreement.

4. <u>Term</u>. The term of this Agreement shall begin on the date that this Agreement is fully signed by the parties hereto ("Effective Date") and shall continue until all work is completed unless and until sooner terminated as hereafter provided. Either party may, in its sole discretion, terminate the Agreement immediately upon written notice upon occurrence of any of the following:

(a) The failure of either to fulfill any of its duties or obligations set forth in this Agreement or any other breach of this Agreement by either;

(b) Upon any action, failure to act or omission by either which is likely to damage, or could result in damage to, the professional reputation and standing of the other or any of its employees, contractors, or personnel; or

(c) In the event of an act of fraud, theft, dishonesty, gross negligence, willful misconduct or felony conviction by either.

Clinic may, in its sole discretion, terminate the Agreement immediately upon written notice upon the death or permanent physical disability of Independent Contractor.

5. <u>Terms and Conditions</u>. This agreement shall be subject to all Terms and Conditions contained as an attachment to this agreement.

IN WITNESS WHEREOF, Clinic has caused this Agreement to be executed and sealed by its duly authorized officer and its seal to be hereunto affixed, and Independent Contractor has executed and sealed this Agreement as of the day and year first above written, and effective as of such date.

**INDEPENDENT CONTRACTOR**

By: _[signature]_
Title: owner
Date: 3/24/04

**WHITMAN-WALKER CLINIC, INC.**

By: _James K Costello_
Title: Chief Information Officer
Date: 3/24/2004

2

## TERMS AND CONDITIONS

1. <u>Compliance with Laws; Indemnification</u>. In performing its duties hereunder, Clinic shall comply with all applicable federal, state, county and local law, orders, rules, ordinances, regulations and codes. Clinic shall indemnify, defend and hold Independent Contractor harmless against any claim, loss, liability, cost or damages sustained by Independent Contractor arising out of, or in any way related to or because of Clinic's noncompliance with any of the foregoing, including without limitation, any gross negligence or willful misconduct by Clinic in performing its duties hereunder.

2. <u>Compliance with Laws; Indemnification</u>. In performing the Services hereunder, Independent Contractor shall comply with all applicable federal, state, county and local law orders, rules, ordinances, regulations and codes. Independent Contractor shall further comply with all policies, bylaws, rules and regulations of Clinic of which Independent Contractor has adequate notice from Clinic. Independent Contractor shall indemnify, defend and hold Clinic, its officers, directors, shareholders, agents and employees (the "Indemnitees") harmless against any claim, loss, liability, cost or damages sustained by any of the Indemnitees arising out of, or in any way related to or because of Independent Contractor's noncompliance with any of the foregoing, including without limitation, any gross negligence or willful misconduct by Independent Contractor in performing the Services hereunder.

3. <u>No Authority to Bind</u>. Independent Contractor shall have no authority to enter into any contracts on behalf of Clinic or otherwise to bind Clinic in any way.

4. <u>Independent Contractor Status</u>. Independent Contractor and Clinic shall be independent, one from the other, and, in the performance of the Services and other work, duties, and obligations under this Agreement. This Agreement sets forth results to be achieved by Independent Contractor and standards to be satisfied by it, but does not create the relationship of an employer and employee. Independent Contractor shall not hold himself out to be or represent to anyone that he is an employee of Clinic, or that his relationship to the Clinic is other than Independent Contractor. Independent Contractor recognizes and agrees that because he is not an employee of Clinic, he will not participate in any pension plan or other benefit plan for employees or be entitled to any fringe benefits of employees of Clinic. Independent Contractor specifically waives any claim to rights or benefits whether present or future, under Clinic's retirement plans, fringe benefits afforded employees of Clinic, or the payment of Social Security taxes by Clinic, Workers' Compensation or Unemployment Compensation or like benefits normally afforded employees of Clinic.

5. <u>No Sanctioned Individuals</u>. Independent Contractor represents and warrants that neither Independent Contractor, nor any of its employees or subcontractors has not been convicted of a criminal offense as described in Sections 1128(a) and 1128(b)(1), (2) or (3) of the Social Security Act (the "Act"), has not had civil money penalties or assessments imposed under Section 1128A of the Act, or has not been excluded from participating in the Medicare Program or any state health care program, and no such action is pending. Independent Contractor shall notify Corporation if an action which could result in conviction of a criminal offense as described in Sections 1128(a) and 1128(b)(1), (2) or (3) of the Social Security Act, imposition of civil money penalties or assessments imposed under Section 1128A of the Act, or exclusion from participating in the Medicare Program or any state health care program, is initiated against Independent Contractor, its employees or subcontractors. Independent Contractor further agrees to notify Corporation immediately of any professional disciplinary proceedings against Independent Contractor in any jurisdiction.

6. <u>Nondisclosure of Confidential Information</u>. Clinic and Independent Contractor acknowledge and understand: (i) that the health care industry is highly competitive; (ii) that Clinic has expended considerable amounts of money, time, and effort cultivating the loyalty and good will of its customers and clients; (iii) that, in the course of performing duties under this Agreement, Independent Contractor will have access to the offices, books, records, files, and other sources of Confidential Information and Trade Secrets relating to the operations of the Clinic; and (iv) that the disclosure of such Confidential Information and Trade Secrets would seriously harm Clinic's operations. Accordingly, Independent Contractor agrees that it will not, during the course of this Agreement, for any reason whatsoever, disclose to any person, firm, Clinic, association or other entity (except in connection with the performance of duties hereunder) or appropriate to its own use or that of any third party, any Confidential Information or Trade Secrets. "Trade Secrets" means information of the Clinic, without regard to form, which is or has been disclosed to Independent Contractor or of which Independent Contractor becomes aware through his performance under this Agreement and which (i) derives economic value, actual or potential, from not being generally known to or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of reasonable efforts to maintain its secrecy, and shall include, without limitation, information obtained from the client files, personnel files or other files, or from the books or other records of Clinic, including without limitation internal practices, policies, procedures, business plans, financial statements and compensation arrangements with employees, contractors and other

personnel. "Confidential Information" means information relating to the business of the Clinic (which does not rise to the level of a trade secret) which has been disclosed or otherwise become known to Independent Contractor as a result of dealings pursuant to this Agreement; which is not generally known to competitors or to the public, and which has been treated as confidential. Independent Contractor also agrees that, upon termination of this Agreement, for any reason whatsoever, Independent Contractor will promptly deliver to the other all documents, files, and in computer discs, and other papers containing any Confidential Information or Trade Secrets without retaining copies thereof in any form. In the event of a breach or threatened breach of this Paragraph 10, Clinic shall be entitled to an injunction restraining the other from such disclosure or threatened disclosure. Nothing herein shall be construed as prohibiting Clinic from pursuing any other remedies available to it for such breach, including recovery of damages.

Notwithstanding any other provision herein to the contrary, Clinic and Independent Contractor hereby agree that the restrictions on Independent Contractor's use or disclosure of Confidential Information under this Paragraph 5 shall survive and remain fully in force and effect for a period of three years after the termination of this Agreement and that the restrictions on Independent Contractor's use or disclosure of Trade Secrets shall survive and remain fully in force and effect for so long as the information qualifies as a Trade Secret under applicable law.

7. Venue and Choice of Law. The Parties agree that any litigation brought under this agreement shall be brought in either federal courts residing in the District of Columbia or in the District of Columbia court system. All matters in dispute will be governed in accordance with the governing law and not the law of conflicts of the District of Columbia. This agreement to arbitrate will survive the termination of this Agreement.

8. Waiver of Breach or Violation not Deemed Continuing. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach hereof.

9. Notices. Any and all notices required or permitted to be given under this Agreement will be sufficient if furnished in writing, sent by registered mail to the respective parties as follows:

   **If to Independent Contractor:**
   Adams & Wight Contracting
   4106 Loston Court – Suite 101
   Fairfax, Virginia 22033

   **If to Clinic:**
   James K Costello
   Acting Director, Property Management
   1407 S St. NW
   Washington, DC 20009

   with a copy to:

   Nicole Greenidge-Hoskins
   General Counsel
   Whitman-Walker Clinic
   1407 S St. NW
   Washington, DC 20009

10. No Assignments. The rights, duties and other obligations of Independent Contractor under this Agreement are personal to Independent Contractor and may not be assigned or otherwise transferred to any other person, corporation or other entity without the prior written consent of Clinic. Nothing in this paragraph or elsewhere in this Agreement shall preclude Clinic from assigning this Agreement to any successor of Clinic or any person corporation, or other entity.

11. Governing Law. This Agreement shall be interpreted, construed and governed according to the laws of the District of Columbia.

12. Paragraph Headings. The paragraph headings contained in this Agreement and the Terms and Conditions are for convenience only and shall in no manner be construed as a part of this Agreement.

13. Entire Agreement. This Agreement supersedes all prior discussions and agreements between Clinic, or any of its officers, directors, employees or agents and Independent Contractor with respect to all matters relating to the engagement by Clinic of Independent Contractor and all other matters contained herein. This Agreement constitutes the sole and entire agreement with respect to matters contained herein and, except as otherwise provided in this Agreement, may be modified only by written agreement of the parties. Any representation inducement, promise or agreement, whether oral or written, between Clinic, or any of its officers, directors, employees or agents and Independent Contractor which is not embodied herein shall be of no force and effect.

14. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement.

15. Survival. Paragraphs 1, 2, 6, 7, 11 and 13 of these Terms and Conditions shall survive the termination of this Agreement and each shall remain in full force and effect thereafter, subject to any applicable time period stated therein.

4